IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Hannah L. Chung, MD, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:25-cv-3015 |
| | § | |
| The University of Texas MD Anderson | § | |
| Cancer Center and Evelyn Starr-High, | § | |
| Defendants. | § | JURY REQUESTED |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Hannah Chung, MD ("Dr. Chung"), files this Original Complaint to obtain injunctive and monetary relief based on Defendants' violation of her due process rights which impacted her liberty interests, and alleges as follows:

### I. NATURE OF SUIT

1.      Pursuant to 42 U.S.C. § 1983, Dr. Chung files this lawsuit against Defendants MD Anderson and Evelyn Starr-High for their violation of Dr. Chung's Constitutional right to due process before depriving her of her liberty interests in her employability, her ability to obtain employment in her chosen field (medical research and publishing based on her clinical work in the field of breast cancer), her professional reputation in the medical community, her honor, and her integrity. Dr. Chung relies on the Fourteenth Amendment of the United States Constitution which provides that no governmental entity shall deprive any person of life, liberty, or property without due process of law.

1

2.     More specifically, Defendants MD Anderson and Evelyn Starr-High failed to provide Dr. Chung any notice that they were going to file a false statement about her with the National Practitioners Data Bank ("NPDB"), a national database that is accessible to healthcare entities nationwide.  Before the Defendants filed a false statement with the NPDB, they failed to provide Dr. Chung with notice or an opportunity to be heard. The Defendants also refused to provide her a chance to clear her name after she had requested a name-clearing hearing.

3.     Because of the Defendants' wrongful actions, Dr. Chung was terminated from her subsequent job with the University of Colorado Medical School. She incurred financial losses and loss of faculty employment. She seeks just compensation for those losses and injunctive relief to remove the false statement from the NPDB. In the alternative, she requests that the Court compel the Defendants to grant her a public name-clearing hearing.

## II.  JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this dispute based on federal question jurisdiction, 28 U.S.C. § 1331 and Article III, Section 2 of the United States Constitution.

5.     This Court has personal jurisdiction over

a.  Defendant MD Anderson, as its principal place of business is located in Texas, and

b.  Evelyn Starr-High, since she is a resident of the State of Texas.

6.     The suit is filed in the proper venue as most of the events underlying this lawsuit occurred in Houston, Texas.

## III. THE PARTIES

7.     The Plaintiff is Hannah L. Chung, MD ("Dr. Chung") who currently resides in the State of Utah.

8.     Defendant The University of Texas MD Anderson Cancer Center ("MD Anderson") is a resident of the State of Texas with its principal place of business located at 1515 Holcomb Blvd., Houston, Texas 77030.  It can be served with process by serving its president, Peter Pisters, located at 1515 Holcomb Blvd., Houston, Texas 77030 or wherever else he may be found.

9.     Defendant Evelyn Starr-High is a resident of the State of Texas and can been served with process by serving her at 1515 Holcomb Blvd., Houston, Texas 77030 or wherever else she may be found.

## IV.  FACTUAL BACKGROUND

### A.  Dr. Chung is Recommended for Early Promotion by her Supervisor.

10.     Dr. Chung received her medical degree in 1995 and has focused her entire career as a radiologist, most of it as a breast radiologist specialist.

11.     Beginning in August 2018, Dr. Chung worked in MD Anderson's Division of Diagnostic Imaging, Department of Radiology, Section of Breast Imaging (which was reorganized in 2019) ("the Department") as a radiologist and Assistant Professor.

12.     Dr. Chung moved to academic medicine after sixteen (16) years in private practice because she wanted to participate in cutting-edge research to help save more lives from breast cancer.

13.     At MD Anderson, Dr. Chung's job duties included:

a.   performing scientific research in the field of radiology, and more specifically, radiology dealing with breast cancer;

b.   writing and publishing articles in scientific journals to report her findings in her research;

c.   providing radiological services to breast cancer patients;

    d.   teaching medical students, residents, and fellows about the techniques and required knowledge needed in the field of breast radiology;

    e.   attending and making presentations at national and international professional conferences; and

    f.   performing administrative tasks such as serving on committees and working on special projects for the institution.

14.    In early 2022, Dr. Chung's supervisor and mentor, Dr. Jessica Leung, recommended that Dr. Chung submit her name for early academic promotion.

15.    Being considered for academic promotion typically occurs at the five-year mark, but because of Dr. Chung's many accomplishments, Dr. Leung recommended that she apply after four years.

**B.  The Chair Blocks Dr. Chung's Promotion and Begins Holding Informal Monthly Meetings to Target Her.**

16.    As she was required to do, in early 2022 Dr. Chung requested the permission of the Chair, Wei Yang, MD ("Dr. Yang"), to submit her promotion packet to MD Anderson's promotion committee.

17.    Dr. Yang previously was the Chair of the Department of Diagnostic Radiology but was demoted in 2019.

18.    After Dr. Yang's demotion, MD Anderson divided the Department of Diagnostic Radiology into five departments, one of which was Breast Imaging.

19.    MD Anderson placed Dr. Yang in the position of Chair of the Breast Imaging Department in 2019.

20.    Prior to early 2022, Dr. Yang had little oversight over Dr. Chung.

21.    Dr. Yang denied Dr. Chung's request to be considered for early promotion.

22.    Dr. Yang began to hold informal monthly meetings with Dr. Chung in March 2022 ("Monthly Meetings").

23.    The only thing that would have prompted Dr. Yang to hold these Monthly Meetings was Dr. Chung's request for a promotion.

24.    Dr. Yang told Dr. Chung that the meetings were necessary to help her "improve."

25.    Meeting monthly did not make sense because there had been no indication that Dr. Chung needed any improvement.

26.    Dr. Yang did not explain to Dr. Chung what actions or performance supposedly needed improvement.

27.    These informal Monthly Meetings ran from March – July 2022.

28.    Drs. Megan Kalambo and Rosalind Candelaria, Dr. Yang's Clinical Medical Directors ("CMD"), selected one or more of Dr. Chung's medical cases to be discussed at the Monthly Meetings.

29.    Dr. Yang provided Dr. Chung either very short or no notice of which cases would be reviewed.

30.    Also, Dr. Yang would at times discuss cases without any file records or any other documents for reference.

31.    During the Monthly Meetings Dr. Yang criticized primarily Dr. Chung's communication style.

32.    In the Monthly Meetings, Dr. Yang focused on matters such as Dr. Chung's writing style or nebulous judgment calls regarding who should have been contacted in what order.

33.    None of Dr. Yang's criticisms in the Monthly Meetings were based on any department policies.

34.    During the Monthly Meetings Dr. Yang never referenced any MD Anderson policy.

35.    None of the cases presented at the Monthly Meetings ever involved any

    a.    adverse patient outcome or

    b.    patient safety issues.

36.    After each Monthly Meeting, Dr. Chung went to her computer and typed what had been said.

37.    Dr. Chung had trouble implementing Dr. Yang's suggestions because they were

    a.    vague and

    b.    subjective.

38.    At one Monthly Meeting, Dr. Yang complained that Dr. Chung attached too many addenda to her reports.

39.    At a later Monthly Meeting, Dr. Yang stated that Dr. Chung did not attach enough addenda.

40.    Dr. Yang at times based her criticisms on inaccurate information.

41.    In a case that was reviewed, a nurse navigator had failed to document her communications in the electronic medical record.

42.    It was the nurse navigator's responsibility in that instance to document her communications in the electronic medical record.

43.    Dr. Yang blamed Dr. Chung for the failure to document the communications in the electronic medical record.

44.    In one Monthly Meeting, Dr. Yang claimed that Dr. Chung's report was not clear enough for another radiologist to step in and perform the procedure. But in that same case, another

radiologist had in fact stepped in and performed the procedure based on Dr. Chung's previous report.

45.    In one of the first cases reviewed, the issue concerned Dr. Kalambo's unhappiness with how Dr. Chung had issued an MRI report after Dr. Kalambo had issued an ultrasound report performed on the same patient. Dr. Kalambo's unhappiness was based on her perception that Dr. Chung's MRI report somehow reflected poorly on Dr. Kalambo.

46.    Dr. Chung implemented Dr. Yang's various suggestions as best she could.

47.    For example, after the Monthly Meeting regarding Dr. Kalambo's unhappiness about the MRI report, Dr. Chung would first try to speak to a radiologist who had written a previous report on the same patient before issuing her report.

48.    In none of the 2022 Monthly Meetings did Dr. Yang ever identify any patient safety issue in the cases discussed.

49.    In none of the 2022 Monthly Meetings did Dr. Yang ever discuss any adverse outcome for any patient seen or imaged by Dr. Chung.

50.    In the July 2022 Monthly Meeting Dr. Chung told Dr. Yang that their discussions

    a.    involved petty grievances by the CMDs,

    b.    were based on cases which usually were months or years old,

    c.    generated subjective, vague complaints by Dr. Yang, and

    d.    that none of the cases had anything to do with patient safety.

51.    Dr. Chung told Dr. Yang that she felt that she was being unfairly targeted and singled out.

52.    Dr. Yang disagreed and stated, to the effect, that they were not meeting to discuss whether Dr. Chung felt targeted and that she could discuss this with HR.

53.     Upon information and belief, Dr. Yang did not have similar Monthly Meetings with any other radiologists in 2022.

**C.  Dr. Yang Provides Dr. Chung No Guidance for Improvement.**

54.     During the Monthly Meetings from March-July 2022, Dr. Yang gave no specific explanation of why any particular wording in any report was inadequate.

55.     Dr. Yang did not refer to any particular policy that Dr. Chung had failed to follow.

56.     Dr. Yang did not point out any procedure that Dr. Chung had done incorrectly.

57.     Dr. Yang never identified any case or patient where there was either

    a.     a patient safety issue or

    b.     an adverse outcome.

58.     Dr. Yang's suggestions for improvement were nebulous.

59.     Dr. Yang never gave Dr. Chung any feedback on whether Dr. Yang saw any improvement or not.

**D.  Dr. Chung Opposed Dr. Yang's New Practice Review Panel.**

60.     Dr. Chung was one of five Department faculty senators whose role was to represent the entire faculty in the Department.

61.     In early 2022 Dr. Yang and her two CMDs had started creating a new Practice Review Panel ("Review Panel"), designed to review medical cases in addition to the official review processes already in place.

62.     The faculty senators believed that the Review Panel would be used punitively.

63.     The faculty senators also were concerned that the Review Panel could be used for political purposes, rather than for improving the quality of performance in the Department.

64.     Dr. Chung spoke out against the new Review Panel at meetings held in

       a.     August 2022 and

       b.     September 2022.

65.     All five faculty senators objected to the Review Panel for several reasons, including:

       a.     Cases were chosen randomly by the two CMDs.

       b.     The faculty were given no prior notice that any of their cases would be chosen but nevertheless had to submit a response to defend their work.

       c.     Panel members who reviewed the cases were required to choose from one of the following five choices, all of which had negative implications to the radiologist who was being reviewed:

          i.     Malevolent or willful misconduct

          ii.     Fitness for duty

          iii.     At risk behavior or possible reckless behavior

          iv.     Possible unintended human error

          v.     System failure

       d.     The two CMDs placed themselves in the role of decision makers.

66.     One of the CMDs, Dr. Kalambo, ran the initial meeting to present and explained Dr. Yang's new Review Panel.

67.     The two PSQOs for the Department resigned from their positions for the same reasons that the faculty senators opposed the Review Panel.

68.     Dr. Yang replaced the two PQSOs who resigned with a junior radiologist who worked in the reading room with Dr. Yang and was a friend of Dr. Candelaria.

69.     Two of Dr. Chung's cases were submitted for review during the first session of this Review Panel.

70.     One of those cases was dismissed before the panel met.

71.     The other case was officially reviewed at a July 27, 2022 Review Panel session.

72.     Dr. Chung was not permitted to attend the July 27, 2022 Review Panel session.

73.     Dr. Chung's case was viewed favorably at that July 27, 2022 Review Panel session by her peer radiologists.

74.     Dr. Chung never received any official feedback about this July 27, 2022 session.

75.     One of her colleagues who attended provided Dr. Chung information about her two cases.

76.     After all the faculty senators so strongly opposed Dr. Yang's new Review Panel, there was no more activity on the subject until December 2022.

77.     In December 2022 the Review Panel was re-introduced.

78.     The faculty senators, including Dr. Chung, continued to object to the Review Panel.

79.     MD Anderson's Executive Committee of the Faculty Senate met with Dr. Yang on January 25, 2023, to discuss whether the Review Panel should continue.

80.     Dr. Chung learned from an attendee that when the Executive Committee questioned Dr. Yang about the Review Panel, she became defensive and tried to place blame on the faculty senators.

81.     After hearing Dr. Yang's comments about the faculty senators, the Executive Committee specifically asked Dr. Yang not to retaliate against the faculty senators for the Executive Committee's opposition of the Review Panel.

82.    After the January 25th meeting, there was no more activity taken by the Review Panel, and it was effectively shut down.

83.    The very next day, January 26, 2023, Dr. Yang issued an annual review of Dr. Chung's performance for 2022 that was negative.

84.    Four weeks later, on February 23, 2023, Dr. Yang non-renewed Dr. Chung's contract.

**E.  Dr. Yang Verbally Places Dr. Chung on an FPPE.**

85.    In September 2022 Dr. Yang informed Dr. Chung that she, Dr. Yang, was placing Dr. Chung on an FPPE, which is an abbreviation for "Focused Professional Practice Evaluation."

86.    Dr. Yang placed Dr. Chung on the FPPE shortly after Dr. Chung had spoken out against the Review Panel at meetings in August and September 2022.

87.    An evaluation based on an FPPE is different from an investigation performed during a medical peer review process.

88.    Medical peer review is a process where physicians assess colleagues' performance, competence, or conduct to ensure high-quality patient care and professional accountability.

89.    A medical peer review includes any evaluation of the accuracy of a diagnosis or quality of the patient care, treatment, or services provided by a health care provider.

90.    At MD Anderson, medical peer review activity requires that a committee, division, department, service, section, or the medical staff meet as a whole.

91.    An individual department chair's evaluation of another physician's job performance is not a medical peer review.

92.    Defendant MD Anderson never conducted a medical peer review of Dr. Chung's performance.

93.    Dr. Yang did not:

a.    inform Dr. Chung what category FPPE that she intended to pursue,

b.    provide Dr. Chung anything in writing related to the FPPE,

c.    provide any document showing that there had been approval given to Dr. Yang from the Credentials Committee of the Medical Staff ("CCMS") for placing Dr. Chung on an FPPE,

d.    specify any deficiency in Dr. Chung's credentials or clinical competency for the FPPE,

e.    mention any issue pertaining to Dr. Chung's professional performance or conduct to be addressed by the FPPE,

f.    identify any patient safety incident prompting the FPPE, or

g.    mention any adverse outcome in any procedure that Dr. Chung had performed that had prompted the FPPE.

94.    Dr. Yang explained to Dr. Chung that the FPPE was "imperative to your academic progress."

95.    Dr. Yang also stated to Dr. Chung that the FPPE was "not a big deal."

96.    For the FPPE, Dr. Yang provided Dr. Chung:

a.    no criteria,

b.    no sentinel or adverse event,

c.    no specific threat to patient safety,

d.    no duration or how long the FPPE would last,

e.    no quality metrics established by the Department that could be tied directly to any individual patient, and

f.   no written objective criteria to follow.

97.   All Dr. Yang did was to state that she was placing Dr. Chung on an FPPE.

98.   On September 23, 2022, Dr. Chung sent Dr. Yang a letter referring to the previous Monthly Meetings and asked Dr. Yang whether the FPPE was the optimal way to handle the situation.

99.   In the September 23, 2022 letter, Dr. Chung stated, among other things: "Your proposal to have me participate in an FPPE seems to be harmful and counterproductive to my success."

100.   Dr. Chung asked Dr. Yang to provide clear and objective expectations for the FPPE.

101.   Dr. Yang did not respond to Dr. Chung's request for clear and objective expectations.

102.   Dr. Chung asked Dr. Yang to permit a faculty navigator and a coach to attend the FPPE meetings.

103.   Dr. Yang did not respond to the request for a faculty navigator and a coach.

104.   Dr. Chung provided Dr. Yang with the names of multiple radiologists within the Department who could serve as judges of the cases discussed during the FPPE meetings.

105.   Dr. Yang did not respond to Dr. Chung's request for Department radiologists to be involved in the FPPE.

106.   Dr. Yang sent Dr. Chung an email on September 27, 2022, stating that "this FPPE was approved by the CCMS."

107.   Dr. Yang did not furnish Dr. Chung a copy of any approval by the CCMS.

108.   Dr. Yang never presented any case at the FPPE meetings with Dr. Chung involving any patient safety issues.

**F. Dr. Chung Files an Internal Complaint Revealing Dr. Yang's Unfair Treatment.**

109.    On September 26, 2022, Dr. Chung filed an internal complaint regarding the Monthly Meetings and the FPPE.

110.    In the complaint, Dr. Chung described details about the Monthly Meetings being held by Dr. Yang and the new FPPE that Dr. Yang had proposed.

111.    In her complaint, Dr. Chung stated that she felt the meetings were designed purposefully with the intent to target and harass her.

112.    On October 6, 2022, Kelly Ferrell, an attorney in MD Anderson's EEO department, met with Dr. Chung to discuss her complaint.

113.    Shortly thereafter, Ms. Ferrell notified Dr. Chung that the matter was closed and that Colleen Barker, an HR representative, would contact Dr. Chung.

114.    Ms. Barker never contacted Dr. Chung.

115.    Nothing was done by MD Anderson about Dr. Chung's complaint filed in September 2022.

**G. Dr. Yang Raises No Patient Safety Issue at the FPPE Meetings.**

116.    Dr. Yang held four FPPE meetings in

    a.    November 2022,

    b.    December 2022,

    c.    January 2023, and

    d.    February 2023.

117.    At the FPPE meetings, Dr. Yang did not discuss with Dr. Chung any case that involved

    a.    An adverse outcome of any procedure performed by Dr. Chung, or

b.      any patient safety issue.

118.    At one FPPE meeting Dr. Yang criticized Dr. Chung for failing to enter a note in the electronic records from a multidisciplinary meeting.

119.    Regarding that multidisciplinary meeting reviewed, the surgeon in charge had already entered into the medical records a note on the agreed plan of action.

120.    It would have been contrary to standard procedures had Dr. Chung, the radiologist, also entered a note in the medical records that added no information different from the surgeon's note that had been entered.

121.    At another FPPE meeting Dr. Yang stated that Dr. Chung should have linked a report contained in the Powerscribe software to another report in the Magview software.

122.    Powerscribe and Magview are two different reporting software applications for electronic medical records.

123.    It is technologically impossible to link a report contained in Powerscribe to another report in Magview.

124.    In another FPPE meeting Dr. Yang criticized Dr. Chung for not giving a differential consideration on a screening mammogram.

125.    Differential diagnoses are not normally given on a screening mammogram but rather at the time of the diagnostic mammogram evaluation.

126.    Stating a differential diagnosis in a report for a screening mammogram would have been contrary to the customary standard for radiologists.

127.    On February 22, 2023, Dr. Yang scheduled the fourth FPPE meeting for the following morning at 7:00 AM.

128.    At the time Dr. Yang scheduled the FPPE meeting for the following morning, Dr. Yang knew that Dr. Chung was starting a two-week vacation on that same day.

129.    February 23, 2023, was the last date when a FPPE meeting was held.

130.    As explained in Section K below, February 23, 2023, was also the same day that Dr. Yang informed Dr. Chung that her contract would not be renewed.

### H.  Dr. Yang Gives Dr. Chung her First Negative Performance Review.

131.    For the years 2018-2021, Dr. Leung, prior Section Chief of Breast Imaging and later the Vice Chair of the Department, had issued the annual reviews of Dr. Chung's performance.

132.    For 2018-2021, Dr. Leung issued positive reviews of Dr. Chung's performance.

133.    Before the annual reviews for 2022 were due, Dr. Yang stated that she intended to review Dr. Chung's performance during the year 2022 instead.

134.    Dr. Yang's decision to take over reviewing Dr. Chung's performance was a deviation from the normal review process.

135.    On January 26, 2023, Dr. Yang issued a negative evaluation of Dr. Chung's work ("Performance Review for 2022").

136.    This was one day after the Executive Committee of the Faculty Senate specifically asked Dr. Yang not to retaliate against the faculty senators for the Executive Committee's opposition of the Review Panel.

137.    Before Dr. Yang's Performance Review for 2022, Dr. Chung had never been given a negative annual review at MD Anderson.

138.    Dr. Yang stated in the Performance Review for 2022 that she had held meetings with Dr. Chung during 2022 to discuss incidents that "involved a patient safety and quality issue."

16

139.    In her Performance Review for 2022, Dr. Yang did not identify any specific case that involved an issue "patient safety" or "quality issue."

140.    During 2022, Dr. Chung had no medical case in which there was an issue involving

    a.    a patient safety issue or

    b.    the quality of her performance of a procedure.

141.    For improvement Dr. Yang recommended that Dr. Chung focus on

    a.    inspiring trust,

    b.    teaming (emotional intelligence),

    c.    developing oneself (accountability), and

    d.    interpersonal communication (accountability).

142.    In the Performance Review for 2022 Dr. Yang did not mention any

    a.    adverse outcome in any procedure,

    b.    deficiency in Dr. Chung's abilities as a radiologist in breast imaging techniques,

    c.    patient safety incident, or

    d.    recommended change to Dr. Chung's clinical processes.

**I.    Dr. Chung Files a Formal Response to Dr. Yang's Performance Review for 2022.**

143.    On January 31, 2023, Dr. Chung submitted a formal objection to Dr. Yang's negative Performance Review for 2022 ("Response to Appraisal").

144.    In Dr. Chung's Response to Appraisal, she pointed out that in her medical cases she had discussed with Dr. Yang during 2022, the "pathology and final outcome showed that my initial interpretations were in fact correct."

17

145.   Dr. Chung summarized in detail each case that had been reviewed with Dr. Yang in 2022 ("Summary of Medical Cases").

146.   Dr. Chung explained how Dr. Yang's criticisms during their meetings in 2022 were

    a.    subjective,

    b.    not quantifiable,

    c.    not related to any patient safety issue, and

    d.    not involving any adverse outcome.

147.   Dr. Chung noted that at every meeting during 2022 she had addressed Dr. Yang's alleged concerns.

**J.   Dr. Yang Again Prevents Dr. Chung from Submitting Her Request for Promotion.**

148.   In mid-February 2023, Dr. Chung again requested Dr. Yang's approval to submit her application to the promotions committee.

149.   Dr. Yang again denied Dr. Chung's request to be considered for promotion.

150.   Dr. Chung persisted by sending Dr. Yang and email "asking you to allow me to go through the process and necessary steps.  I am happy to discuss but I believe the 'sustained improvements' are in place."

151.   Dr. Yang never responded to Dr. Chung's email requesting approval to be considered for promotion.

**K.   Dr. Yang Non-Renews Dr. Chung's Contract of Employment.**

152.   On February 23, 2023, Dr. Yang sent Dr. Chung an email stating that she, Dr. Yang, had decided not to renew Dr. Chung's contract for the coming academic year.

153.   The non-renewal of Dr. Chung's contract meant that on August 31, 2023, her employment with MD Anderson would terminate.

154.   An employer's action terminating an employee's employment is the same as discharging that employee.

155.   Dr. Yang gave no reason for ending Dr. Chung's contract.

156.   On February 28, 2023, Dr. Carin Hagberg ("Dr. Hagberg"), MD Anderson's Chief Academic Officer, sent a letter officially notifying Dr. Chung of the non-renewal of her faculty appointment.

157.   Dr. Hagberg gave as a reason for the decision to end Dr. Chung's employment "ongoing performance and communication issues."

158.   Dr. Chung responded by sending a letter to Dr. Hagberg on March 10, 2023.

159.   Dr. Chung attached to her March 10, 2023 letter her Summary of Medical Cases, the cases that had been reviewed by Dr. Yang at the various meetings.

160.   Dr. Chung noted that "in all cases, there was no wrongdoing and the outcomes of the cases proved I was correct."

161.   Dr. Chung also asked Dr. Hagberg to consider that any further action in the FPPE should not be necessary since she would no longer be on faculty.

162.   Dr. Chung ended her letter by asking Dr. Hagberg, "I urge you to review the attached cases.  I believe an honest analysis will prove my case that I was unjustly and unfairly targeted."

163.   Neither Dr. Hagberg nor anyone in management responded to Dr. Chung's March 10, 2023 letter.

**L.  Dr. Chung Files an Internal Retaliation Complaint Against Dr. Yang.**

164.   On February 27, 2023, Dr. Chung filed an internal complaint of retaliation against Dr. Yang ("Retaliation Complaint").

165.    Dr. Chung attached to her Retaliation Complaint a timeline of events and the same Summary of Medical Cases as was attached to her Response to Appraisal.

166.    MD Anderson engaged the law firm Foley & Lardner LLP to investigate Dr. Chung's Retaliation Complaint.

167.    Dr. Chung engaged the services of an attorney for the investigation of her Retaliation Complaint.

168.    Dr. Chung's attorney took over the communications with the Foley & Lardner attorneys relating to the Retaliation Complaint.

169.    Dr. Chung wanted the investigation of Dr. Yang's actions to move forward and was willing to cooperate as needed.

170.    Dr. Chung was never interviewed about the allegations in her Retaliation Complaint.

171.    Dr. Chung's Retaliation Complaint against Dr. Yang was never resolved.

**M. Dr. Yang Persuades the ECMS to Approve Proctoring and an Assessment of Dr. Chung's Vision.**

172.    Sometime in early 2023, Dr. Yang met with the CCMS regarding Dr. Chung's FPPE.

173.    The CCMS approved Dr. Yang's request to increase the requirements of the FPPE.

174.    Proctoring and an eye examination were added to Dr. Chung's FPPE.

175.    A proctor is a practitioner selected by the Department Chair who observes, evaluates, and reports on a practitioner's ability to deliver high-quality services.

176.    A proctor reports to the Department Chair.

177.    At the CCMS meeting where proctoring was added to the FPPE, an examination of Dr. Chung's eyesight also was added.

20

178.   There was nothing wrong with Dr. Chung's eyesight, as she wore contact lenses or glasses.

179.   On March 15, 2023, Dr. Michael Overman, the ECMS Chair, sent a letter to Dr. Chung informing her that the ECMS had approved the two additional requirements to be added to the FPPE: (1) a proctor and (2) an examination of Dr. Chung's eyesight.

180.   Dr. Overman's March 15, 2023, letter stated that should Dr. Chung refuse to participate in the two additional terms, she would be permitted to meet with the ECMS to present information.

181.   Dr. Overman's March 15, 2023, letter is the only document regarding the FPPE that was ever provided to Dr. Chung.

182.   Dr. Overman gave two reasons for approving the two new conditions for the FPPE process: "poor ratings and a safety event involving a wrong site localization."

183.   The only document containing a "poor rating" that Dr. Chung had ever received was Dr. Yang's Performance Review for 2022.

184.   In none of her meetings with Dr. Yang had Dr. Chung ever been accused of performing a "wrong site localization."

185.   On March 16, 2023, Dr. Yang and the PSQO met with Dr. Chung to discuss proctoring.

186.   Dr. Yang informed Dr. Chung at the March 16, 2023, meeting that the two CMDs and the PSQO would be the proctors.

187.   All three radiologists named by Dr. Yang as proctors

    a.    were less qualified,

    b.    had less experience in the procedures to be monitored, and

c.     had worked fewer years as a radiologist than Dr. Chung.

188.    Dr. Yang was the person who selected the two CMDs and the PSQO to be proctors who would observe and report on Dr. Chung's ability to perform radiological procedures.

189.    During their March 16, 2023 meeting, Dr. Chung stated that before she could agree one way or the other to the proctoring requirement, she wanted to defer until she had a chance to meet with the ECMS/CCMS.

190.    Dr. Chung wanted to present the facts of her medical cases to the ECMS/CCMS.

191.    On March 16, 2023, Dr. Chung stated in an email to Dr. Yang that she planned to discuss with the CCMS/ECMS her perspective of the cases that Dr. Yang had presented to the CCMS to obtain approval of the two additional FPPE requirements.

192.    In the same email, Dr. Chung restated their previous conversation about the eyesight examination. "Specifically, I asked if there was a particular incident where I had failed to identify a finding due to a potential problem in my eyesight, and there was none."

193.    Dr. Yang did not respond to this March 16, 2023 email.

## N.  The ECMS Refused Dr. Chung's Request to Review the Merits of the Continuing FPPE.

194.    Based on Dr. Overman's March 15, 2023 letter, Dr. Chung requested a meeting with the ECMS to present information about the medical cases and what Dr. Yang was doing.

195.    On March 27, 2023, Dr. Chung met with Dr. Overman and Evelyn Starr-High, Director of the Medical Staff and Credentialing Services.

196.    At the March 27, 2023 meeting, Dr. Overman would not permit Dr. Chung to get into the specifics of her cases or the occurrences in the FPPE meetings.

197.    Dr. Overman limited the meeting on March 27, 2023 to the FPPE "process."

198.   Dr. Overman would not discuss the explanation of any medical cases during the March 27, 2023 meeting with Dr. Chung.

199.   MD Anderson typically records a physician's meeting with the ECMS when the meeting is held online via Zoom.

200.   The March 27, 2023 meeting of Dr. Overman, Evelyn Starr-High, and Dr. Chung was recorded on Zoom.

201.   After the March 27, 2023 meeting, Dr. Overman sent an email to Dr. Chung reiterating that the two additional conditions, proctoring and an eye examination, were going forward.

**O.  Dr. Chung Resigns to Accept a Faculty Position with the University of Colorado.**

202.   Dr. Chung took a medical leave of absence from work starting April 4, 2023.

203.   As of April 2023, Dr. Chung's record contained no negative report or any documents regarding any type of investigation, formal or informal.

204.   No complaint had ever been filed against Dr. Chung by anyone at MD Anderson, by any patient or by any healthcare provider.

205.   On April 12, 2023, the University of Colorado Medical School offered Dr. Chung a faculty position as Assistant Professor in its Department of Radiology, Section of Breast Imaging.

206.   In this faculty position, Dr. Chung would be able to continue her work in academics and research in the field of radiology dealing with breast cancer.

207.   The University of Colorado Medical School needed Dr. Chung to start work on June 1, 2023.

208.   On May 27, 2023, Dr. Chung emailed her letter of resignation to Dr. Yang.

209.    On May 29, 2023, Dr. Yang emailed Dr. Chung stating that her resignation was accepted, with copies to Dr. Overman, Starr-High, and Dr. Chung's attorney.

210.    Dr. Yang's email did not mention the FPPE.

**P.    MD Anderson Files a False Report with the NPDB.**

211.    Dr. Chung began her new job with the University of Colorado Medical School on June 1, 2023.

212.    On June 28, 2023, Evelyn Starr-High, on behalf of MD Anderson, filed a report with the National Practitioner Data Bank ("NPDB Report").

213.    The National Practitioner Data Bank (NPDB) is part of the U.S. Department of Health and Human Services.

214.    The NPDB is a web-based repository of reports containing information on adverse actions related to physicians, health care providers, and suppliers.

215.    Established by Congress in 1986, the NPDB is a workforce tool that is meant to prevent practitioners from hiding malpractice claims by moving state to state without disclosing previous damaging performance.

216.    Hospitals, licensing boards, and most healthcare entities all have access to the information filed in the NPDB.

217.    In the NPDB Report, MD Anderson made false statements pertaining Dr. Chung's professional competence and conduct as a radiologist.

218.    The false statements in the NPDB Report were connected to the non-renewal of Dr. Chung's contract effective August 31, 2023 because they both made the same false charges against Dr. Chung, performance issues related to her professional competence and conduct.

219.    MD Anderson's report to the NPDB provided the following information:

     a.  Dr. Chung had voluntarily surrendered her clinical privileges while under, or to avoid, investigation relating to her professional competence or conduct;

     b.  The ECMS had initiated an FPPE concerning Dr. Chung's practice;

     c.  The ECMS had recommended concurrent proctoring of certain radiology procedures performed by Dr. Chung;

     d.  Before the ECMS could initiate the proctoring, Dr. Chung resigned.

220.   Dr. Chung was never under investigation.

221.   Dr. Chung did not resign to avoid any investigation.

222.   The reason why Dr. Chung resigned was to begin her new job at the University of Colorado School of Medicine.

223.   Dr. Chung never committed any action or omission constituting

     a.    professional incompetence or

     b.    misconduct which affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges.

224.   The ECMS never initiated an investigation of Dr. Chung's professional

     a.    competence or

     b.    conduct which affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges.

225.   The ECMS never initiated an FPPE regarding Dr. Chung's job performance.

226.   Dr. Chung's FPPE was initiated by Dr. Yang.

227.   Based on the definition of "Investigation" contained in MD Anderson's Bylaws, the FPPE initiated by Dr. Yang was not an investigation of Dr. Chung's professional competence or

conduct which affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges.

228. Based on information and belief, MD Anderson implemented the term "investigation" in other instances consistent with the definition in the Bylaws, which did not include an FPPE.

229. Evelyn Starr-High knew that the NPDB Report contained false statements before she filed it with the NPDB.

230. MD Anderson and Evelyn Starr-High knew that the FPPE of Dr. Chung referenced in the NPDB Report was not in the furtherance of quality health care.

231. MD Anderson and Evelyn Starr-High did not make a reasonable effort to obtain the facts contained in Dr. Chung's medical case files.

232. MD Anderson and Evelyn Starr-High failed to give Dr. Chung any notice or hearing procedures before filing the NPDB Report.

233. MD Anderson and Evelyn Starr-High had no reasonable basis to believe that filing the NPDB Report was warranted.

234. The NPDB Report was not filed in order to further quality health care.

235. Indeed, filing the NPDB Report was not warranted. The NPDB rules did not require MD Anderson to file the NPDB Report.

236. MD Anderson and Evelyn Starr-High knew that reports filed with the NPDB are publicly displayed and a required report to all medical entities and healthcare providers who employ physicians to do research in the field of breast cancer.

237. MD Anderson and Evelyn Starr-High should have substantial knowledge of the Health Care Quality Improvement Act.

238.    Because of the regulations under the Health Care Quality Improvement Act, MD Anderson and Evelyn Starr-High knew that the false NPDB Report would be provided to Dr. Chung's new employer, the University of Colorado Medical School.

239.    MD Anderson, through the actions of Evelyn Starr-High, knowingly filed false statements with the NPDB that would damage Dr. Chung's medical career at any research institution and would likely cause the University of Colorado Medical School to terminate Dr. Chung.

**Q.  Because of MD Anderson's NPDB Report, Dr. Chung is Terminated.**

240.    Regulations promulgated under the Health Care Quality Improvement Act require the NPDB to provide notice of any new information reported about a physician to any entity who, within the previous three (3) years, has inquired about that physician.

241.    The NPDB provided notice to Dr. Chung's employer, the University of Colorado Medical School, that MD Anderson had filed a negative report about Dr. Chung.

242.    The University of Colorado Medical School contacted MD Anderson and requested information about the NPDB Report.

243.    MD Anderson responded to the University of Colorado Medical School's request for information.

244.    After receiving the information from MD Anderson, the University of Colorado Medical School terminated Dr. Chung's employment.

**R.  The Texas Medical Board Rules in Favor of Dr. Chung.**

245.    Because of the NPDB Report filed by MD Anderson against Dr. Chung, the Texas Medical Board ("TMB") also reviewed the entire situation.

246.    Dr. Chung and MD Anderson separately submitted documents and information for the TMB to review.

247.    On January 17, 2025, the TMB issued a statement to Dr. Chung explaining that after reviewing the materials submitted by the parties, the TMB had concluded that Dr. Chung's actions did not fall below the acceptable standard of care.

248.    The TMB completely exonerated Dr. Chung from any form of professional incompetence or misconduct of the type which affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges.

**S.    MD Anderson Refuses to Grant Dr. Chung a Name-Clearing Hearing**

249.    On February 3, 2025, Dr. Chung's counsel wrote MD Anderson's counsel and requested a name-clearing hearing.

250.    On March 17, 2025, MD Anderson's counsel responded refusing Dr. Chung's request for a name-clearing hearing.

**V.    CAUSES OF ACTION AGAINST DEFENDANT MD ANDERSON BASED ON ITS VIOLATION OF PLAINTIFF'S DUE PROCESS RIGHTS**

251.    Dr. Chung incorporates paragraphs 10 – 250 as incorporated herein verbatim.

252.    Dr. Chung had a liberty interest in employability, her ability to obtain and maintain employment in her chosen field, her professional reputation in the medical community, her honor, and her integrity.  Dr. Chung's liberty interest was secured by the Fourteenth Amendment to the United States Constitution.

253.    In particular, Dr. Chung had a liberty interest in remaining employed by the University of Colorado Medical School without unlawful interference from the Defendants.

<u>FIRST CAUSE OF ACTION</u>
**MD Anderson's Failure to Provide Dr. Chung Notice and the Right to be Heard Before
Filing the NPDB Report**

254.    MD Anderson deprived Dr. Chung of her liberty interest by filing a false report with the NPDB without first providing her due process.

255.    MD Anderson did not provide Dr. Chung any notice before filing the false NPDB report.

256.    Before filing the false NPDB report, MD Anderson did not provide Dr. Chung an opportunity to be heard.

257.    Had MD Anderson provided Dr. Chung with appropriate notice and an opportunity to be heard, Dr. Chung could have been able taken appropriate steps such that the outcome would have been different, including MD Anderson not filing the false NPDB report.

258.    An official policy or custom of MD Anderson, permitting Evelyn Starr-High to file reports with the NPDB about a physician who had resigned, including statements that are not true, was an approved policy of MD Anderson.

259.    This policy was a cause in fact of the deprivation of Dr. Chung's rights.

260.    It was the execution of this policy, made by those whose edicts or decisions may fairly be said to be MD Anderson's official policy which inflicted the harm to Dr. Chung for which MD Anderson is responsible.

261.    MD Anderson's ECMS and legal department approved the official policy or custom.

262.    MD Anderson's official policy or custom was a "moving force" behind the deprivation of Dr. Chung's Constitutional rights.

29

263.    Therefore, because of MD Anderson's violation of Dr. Chung's Constitutional right of due process before depriving her of her protected liberty interests, Dr. Chung is entitled to injunctive relief from MD Anderson in the form of an Order directing MD Anderson to cease and desist publishing the report that it filed with the NPDB on June 28, 2023, which will take the form of retracting the NPDB Report and, in the alternative, to grant a public hearing allowing Dr. Chung to clear her name.

**SECOND CAUSE OF ACTION**
**MD Anderson's Failure to Provide Dr. Chung a Name-Clearing Hearing**
**After Filing the NPDB Report**

264.    MD Anderson violated Dr. Chung's right of due process by refusing to provide a name-clearing hearing.

265.    Dr. Chung was discharged when MD Anderson decided to end her employment by non-renewing her contract.

266.    In its NPDB Report, MD Anderson conveyed a false and stigmatizing message about Dr. Chung.

267.    The false and stigmatizing message conveyed by MD Anderson was that Dr. Chung was incompetent in some regard in how she provided radiological services to breast cancer patients and that she was guilty of some unstated professional misconduct that affected or could have adversely affected the health or welfare of a patient or patients, so serious as to negatively affect her privileges to provide such services.

268.    The false and stigmatizing message conveyed by MD Anderson indicated that Dr. Chung's professional incompetence and misconduct was so severe that a proctor was needed to monitor her work.

269. The stigmatizing message was connected with Dr. Chung's discharge because it was the same as the reason given for MD Anderson's non-renewing her contract, "ongoing performance issues," meaning that her performance of her work as a radiologist was so poor that her contract was not renewed.

270. The NPDB Report was filed by MD Anderson in the context of its ending Dr. Chung's employment based on allegations of professional incompetence and misconduct.

271. MD Anderson's report to the NPDB was false by stating that:

    a.    Dr. Chung had voluntarily surrendered her clinical privileges while under or to avoid investigation relating to her professional competence or conduct;

    b.    the ECMS had initiated an FPPE concerning Dr. Chung's practice;

    c.    the ECMS had recommended proctoring of Dr. Chung's radiology work;

    d.    before the ECMS could initiate the proctoring, Dr. Chung resigned.

272. Dr. Chung was never under "Investigation" as that term is used by MD Anderson.

273. Rather, Dr. Chung attended meetings with Dr. Yang in the context of an FPPE.

274. The FPPE initiated by Dr. Yang was not an "investigation" of Dr. Chung's professional competence or conduct which

    a.    affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges;

    b.    followed the receipt of a request for corrective action based on her professional competence or conduct; or

    c.    arose from the issuance of an Adverse Recommendation or Action based on her professional competence or conduct in the course of initial membership, reappointment, or processing of a request for clinical privileges.

275.    Dr. Chung did not resign to avoid any investigation.

276.    The reason why Dr. Chung resigned was to begin her new job at the University of Colorado Medical School.

277.    Dr. Chung never committed any action or omission constituting

      a.    professional incompetence or

      b.    misconduct

which affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges.

278.    The ECMS never initiated an investigation of Dr. Chung's professional

      a.    competence or

      b.    conduct

which affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges.

279.    The ECMS never initiated an FPPE regarding Dr. Chung's job performance.

280.    Dr. Chung's FPPE was initiated by Dr. Yang.

281.    MD Anderson never provided Dr. Chung any notice or an opportunity to be heard prior to the filing of the NPDB Report.

282.    MD Anderson's false NPDB Report was made public since any healthcare entity that employs physicians to do research in breast cancer could access the database and read the NPDB Report.

283.    Dr. Chung requested a hearing to clear her name by letter dated February 3, 2025.

284.    MD Anderson denied Dr. Chung's request for a name-clearing hearing by letter dated March 17, 2025.

285.    Because of MD Anderson's false NPDB Report, Dr. Chung's employment was terminated by the University of Colorado Medical School.

286.    Because of MD Anderson's false NPDB Report, Dr. Chung has been prevented from obtaining employment within her chosen field of employment, which is medical research and publishing in the field of breast cancer, which was confirmed by her actual termination from the University of Colorado Medical School.

287.    MD Anderson knew from its own records, the medical case files, that Dr. Chung never acted or failed to act in a way that affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges.

288.    MD Anderson knew from its own records, the medical case files, that Dr. Chung's radiological work was validated by pathology reports and by positive outcomes for all patients involved.

289.    MD Anderson

a.    knew that the FPPE of Dr. Chung referenced in the NPDB Report was not in the furtherance of quality health care;

b.    did not make a reasonable effort to obtain the facts regarding Dr. Chung's professional competence and conduct, facts contained her medical case files;

c.    failed to give Dr. Chung any notice or hearing procedure before filing the NPDB Report, and

d.    had no reasonable basis to believe that filing the NPDB Report was warranted.

33

290.    MD Anderson knew that its false NPDB Report would seriously damage Dr. Chung's standing and associations in the medical community, put Dr. Chung's good name, reputation, honor, and integrity at stake, would impose a stigma that would foreclose the freedom to take advantage of other employment opportunities, and cause her to lose her job at the University of Colorado Medical School.

291.    An official policy or custom of MD Anderson, permitting Evelyn Starr-High to file reports with the NPDB about a physician who had resigned, including statements that are not true, was a cause in fact of the deprivation of Dr. Chung's rights.

292.    MD Anderson's ECMS and legal department approved the official policy or custom.

293.    MD Anderson's official policy or custom was a "moving force" behind the deprivation of Dr. Chung's Constitutional rights.

294.    Therefore, because of MD Anderson's violation of Dr. Chung's Constitutional right of due process before depriving her of her protected liberty interests, Dr. Chung is entitled to injunctive relief from MD Anderson in the form of an Order directing MD Anderson to cease and desist publishing the report that it filed with the NPDB on June 28, 2023, which will take the form of retracting the NPDB Report and, in the alternative, to grant Dr. Chung a public hearing to clear her name..

## VI. CAUSES OF ACTION AGAINST DEFENDANT EVELYN STARR-HIGH BASED ON HER VIOLATION OF PLAINTIFF'S DUE PROCESS RIGHTS

### THIRD CAUSE OF ACTION
**Evelyn Starr High's Violation of Dr. Chung's Due Process Rights of Notice and to Be Heard**

295.    Dr. Chung incorporates paragraphs 10 – 294 as incorporated herein verbatim.

296.   Evelyn Starr-High, acting in her official capacity, deprived Dr. Chung of her liberty interest by filing a false report with the NPDB without first providing her due process.

297.   Starr-High did not provide Dr. Chung any notice before filing the false NPDB report.

298.   Before filing the false NPDB report, Starr-High did not provide Dr. Chung an opportunity to be heard.

299.   Had Starr-High provided Dr. Chung with appropriate notice and an opportunity to be heard, Dr. Chung could have been able taken appropriate steps such that the outcome would have been different, including Starr-High not filing the false NPDB report.

300.   In the NPDB Report, Starr-High conveyed a false and stigmatizing message about Dr. Chung.

301.   The false and stigmatizing message conveyed by Starr-High was that Dr. Chung was incompetent in how she provided radiological services to breast cancer patients and that she was guilty of professional misconduct that affected or could have adversely affected the health or welfare of a patient or patients, so serious as to negatively affect her privileges to provide such services.

302.   The false and stigmatizing message conveyed by Starr-High indicated that Dr. Chung's professional incompetence and misconduct was so severe that a proctor was needed to monitor her work.

303.   The stigmatizing message was connected with Dr. Chung's discharge because it was the same as the reason given for MD Anderson's non-renewing her contract, "ongoing performance issues," meaning that her performance of her work as a radiologist was so poor that her contract was not renewed.

304.    The NPDB Report was filed by Starr-High in the context of its ending Dr. Chung's employment based on allegations of professional incompetence and misconduct.

305.    The NPDB Report was false by stating that:

    a.   Dr. Chung had voluntarily surrendered her clinical privileges while under or to avoid investigation relating to her professional competence or conduct;

    b.   the ECMS had initiated an FPPE concerning Dr. Chung's practice;

    c.   the ECMS had recommended proctoring of Dr. Chung's radiology work;

    d.   before the ECMS could initiate the proctoring, Dr. Chung resigned.

306.    Dr. Chung was never under "Investigation" as that term is used in MD Anderson's Medical Staff Bylaws.

307.    Rather, Dr. Chung attended meetings with Dr. Yang in the context of an FPPE.

308.    The FPPE initiated by Dr. Yang was not an "investigation" of Dr. Chung's professional competence or conduct which

    a.   affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges;

    b.   followed the receipt of a request for corrective action based on her professional competence or conduct; or

    c.   arose from the issuance of an Adverse Recommendation or Action based on her professional competence or conduct in the course of initial membership, reappointment, or processing of a request for clinical privileges.

309.    Dr. Chung did not resign to avoid any investigation.

310.    The reason why Dr. Chung resigned was to begin her new job at the University of Colorado Medical School.

311.    Dr. Chung never committed any action or omission constituting

      a.     professional incompetence or

      b.     misconduct

which affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges.

312.    The ECMS never initiated an investigation of Dr. Chung's professional

      a.     competence or

      b.     conduct

which affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges.

313.    The ECMS never initiated an FPPE regarding Dr. Chung's job performance.

314.    Dr. Chung's FPPE was initiated by Dr. Yang.

315.    Starr-High never provided Dr. Chung any notice or an opportunity to be heard prior to the filing of the NPDB Report.

316.    The NPDB Report was made public since any healthcare entity that employs physicians to do research in breast cancer could access the database and read the NPDB Report.

317.    Dr. Chung requested a hearing to clear her name by letter dated February 3, 2025.

318.    MD Anderson denied Dr. Chung's request for a name-clearing hearing by letter dated March 17, 2025.

319.    Based on information and belief, including Starr-High's position at MD Anderson, Starr-High was involved in the decision to deny Dr. Chung the name-clearing hearing.

320.    Because of the NPDB Report, Dr. Chung's employment was terminated by the University of Colorado Medical School.

321.    Because of the NPDB Report, Dr. Chung has been prevented from obtaining employment within her chosen field of employment, which is medical research and publishing based on her clinical work in the field of breast cancer, which was confirmed by Dr. Chung's termination from the University of Colorado Medical School.

322.    Starr-High's conduct in filing a false NPDB report without providing any form of due process to Dr. Chung violated clearly established statutory and constitutional rights of which a reasonable person would have known.

323.    Starr-High deprived Dr. Chung of her liberty interests when she violated Dr. Chung's rights to

      a.  notice before the NPDB Report was filed,

      b.  to be heard regarding Dr. Chung's perspective of the situation, and

      c.  after the wrongful NPDB Report was filed, a name-clearing hearing.

324.    These rights have been established since at least 1972 by United States Supreme Court precedent.

325.    The contours of these rights have been defined in many cases since 1972.

326.    In defining the scope of protected liberty interests under the Fourteenth Amendment, the United States Supreme Court has stated that a liberty interest denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of one's own conscience, and generally to enjoy those privileges long recognized as essential to the orderly pursuit of happiness by free men.

327.    Starr-High deprived Dr. Chung of her liberty interest in maintaining her position with the University of Colorado Medical School, her employability, her ability to obtain

employment in her chosen field, her professional reputation in the medical community, her honor, and her integrity.

328.    Starr-High also violated the Heath Care Quality Improvement Act ("HCQIA") which

      a.    requires providing due process rights to physicians before taking an adverse action against a physician, and

      b.    prohibits the filing of a report with NPDB which the filer has actual knowledge that the report is false.

329.    In her position as Director of the Medical Staff and Credentialing Services, Starr-High had to know the law governing how reports should be worded when they are filed with the NPDB.

330.    In her position as Director of the Medical Staff and Credentialing Services, as of June 28, 2023, Evelyn Starr-High had to know the law governing the falsity of reports made to the NPDB and that submitting a report to the NPDB when she had actual knowledge of the falsity of the information contained in the report was contrary to the law.

331.    Starr-High had access to the records and files regarding the radiological services that Dr. Chung had provided to MD Anderson patients.

332.    Starr-High knew from the records and files regarding Dr. Chung's medical cases, that there were, in fact, no issues of patient safety and that Dr. Chung never acted or failed to act in a way that affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges.

333.    Starr-High had access to records related to Dr. Chung's FPPE.

334.    Starr-High attended meetings of the ECMS when Dr. Chung's FPPE was discussed.

39

335.   Starr-High knew before she filed the NPDB Report that the ECMS did not initiate the FPPE concerning Dr. Chung's practice.

336.   Starr-High knew before she filed the NPDB Report that the ECMS was not the one who recommended proctoring of certain procedures to be performed by Dr. Chung.

337.   Starr-High knew that in the Spring 2023 it was Dr. Yang who requested that the requirements for Dr. Chung's FPPE be increased.

338.   Starr-High knew before she filed the NPDB Report that proctoring was added to Dr. Chung's FPPE because of actions taken by Dr. Yang to increase the FPPE requirements.

339.   Starr-High knew before she filed the NPDB Report that Dr. Chung had resigned, not to avoid any investigation, but to take a position with the University of Colorado Medical School.

340.   The ECMS did not initiate any investigation of Dr. Chung.

341.   The ECMS did not initiate Dr. Chung's FPPE.

342.   The ECMS did not recommend the proctoring of certain procedures performed by Dr. Chung.

343.   At the time Dr. Chung resigned, there was no ongoing investigation related to her professional competence or conduct that affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges.

344.   Dr. Chung resigned her employment with MD Anderson on May 27, 2023, not to avoid any investigation, but to take a position with the University of Colorado Medical School.

345.   The NPDB Report filed on June 28, 2023 contained false information.

346.   Starr-High had actual knowledge before she filed the NPDB Report on June 28, 2023, that the report contained false information.

347. Starr-High knew from MD Anderson's records, the medical case files, that Dr. Chung never acted or failed to act in a way that affected or could have adversely affected the health or welfare of a patient or patients or her clinical privileges.

348. Starr-High knew from MD Anderson's records, the medical case files, that Dr. Chung's radiological work was validated by pathology reports and by positive outcomes for all patients involved.

349. Starr-High

    a.    knew that the FPPE of Dr. Chung referenced in the NPDB Report was not in the furtherance of quality health care;

    b.    did not make a reasonable effort to obtain the facts regarding Dr. Chung's professional competence and conduct, facts contained her medical case files;

    c.    failed to give Dr. Chung any notice or hearing procedure before filing the NPDB Report, and

    d.    had no reasonable basis to believe that filing the NPDB Report was warranted.

350. Therefore, because of her violations of Dr. Chung's due process rights, Starr-High is liable for Dr. Chung's damages caused by these violations.

### FOURTH CAUSE OF ACTION
### Evelyn Starr-High's Failure to Provide Dr. Chung a Name-Clearing Hearing After Filing the NPDB Report

351. Dr. Chung incorporates paragraphs 10 – 350 as incorporated herein verbatim.

352. Starr-High violated Dr. Chung's right of due process by refusing to provide a name-clearing hearing.

353. Dr. Chung was discharged when MD Anderson decided to end her employment by non-renewing her contract.

354. In the NPDB Report, Starr-High conveyed a false and stigmatizing message about Dr. Chung.

355. The false and stigmatizing message conveyed by Starr-High was that Dr. Chung was incompetent in how she provided radiological services to breast cancer patients and that she was guilty of professional misconduct that affected or could have adversely affected the health or welfare of a patient or patients, so serious as to negatively affect her privileges to provide such services.

356. The false and stigmatizing message conveyed by Starr-High indicated that Dr. Chung's professional incompetence and misconduct was so severe that a proctor was needed to monitor her work.

357. The stigmatizing message was connected with Dr. Chung's discharge because it was the same as the reason given for MD Anderson's non-renewing her contract, "ongoing performance issues," meaning that her performance of her work as a radiologist was so poor that her contract was not renewed.

358. The NPDB Report was filed by Starr-High in the context of its ending Dr. Chung's employment based on allegations of professional incompetence and misconduct.

359. Starr-High never provided Dr. Chung any notice or an opportunity to be heard prior to the filing of the NPDB Report.

360.   The NPDB Report was made public since any healthcare entity that employs physicians to do research in breast cancer could access the database and read the NPDB Report.

361.   Dr. Chung requested a hearing to clear her name by letter dated February 3, 2025.

362.   MD Anderson denied Dr. Chung's request for a name-clearing hearing by letter dated March 17, 2025.

363.   Based on information and belief, including Starr-High's position at MD Anderson, Starr-High was involved in the decision to deny Dr. Chung the name-clearing hearing.

364.   Because of the NPDB Report, Dr. Chung's employment was terminated by the University of Colorado Medical School.

365.   Because of the NPDB Report, Dr. Chung has been prevented from obtaining employment within her chosen field of employment, which is medical research and publishing based on her clinical work in the field of breast cancer, which was confirmed by Dr. Chung's termination from the University of Colorado Medical School.

## IX.  INJUNCTIVE RELIEF SOUGHT FROM DEFENDANT MD ANDERSON

366.   Dr. Chung incorporates paragraphs 10 – 365 as incorporated herein verbatim.

367.   As set forth above, MD Anderson violated Dr. Chung's Constitutional rights, giving Dr. Chung a right of relief against MD Anderson.

368.   Dr. Chung seeks injunctive relief from MD Anderson for its Constitutional violations, specifically that MD Anderson must

    a.    cease and desist from continuing to publish its NPDB Report and

    b.    retract the NPDB Report in its entirety.

    c.    In the alternative, be compelled to grant Dr. Chung a public name-clearing hearing.

## VII.    MONETARY RELIEF SOUGHT FROM DEFENDANT EVELYN STARR-HIGH

369.    Dr. Chung incorporates paragraphs 10 – 368 as incorporated herein verbatim.

370.    As set forth above, Defendant Evelyn Starr-High violated Dr. Chung's Constitutional and statutory rights, giving Dr. Chung a right of recovery against Defendant Evelyn Starr-High.

371.    Dr. Chung seeks to recover her damages from Starr-High for the following elements of loss that they have caused, which is monetary damages for

   a.    Dr. Chung's loss of her position at the University of Colorado Medical School;

   b.    her loss of opportunities for employment at other institutions that hire employees to perform research in the area of breast cancer; and

   c.    damage to her career and her professional reputation within the medical community.

## VIII.   JURY DEMAND

372.    Dr. Chung requests a trial by jury.

## IX. PRAYER

WHEREFORE, Plaintiff, Dr. Chung, respectfully requests this Court to

   a.   Enjoin Defendant MD Anderson

      i.    from continuing to publish the report about Dr. Chung that it filed with the NPDB on June 28, 2023,

      ii.   to permanently retract that report, and,

      iii.  In the alternative, compel MD Anderson to grant Dr. Chung a name-clearing hearing;

b.  Order Defendant Evelyn Starr-High to pay Dr. Chung a monetary amount that will compensate her for the damage done to her career, loss of income and benefits due to the termination of her employment by the University of Colorado Medical School, and her reputation and standing in the medical community;

c.  Award Dr. Chung attorneys' fees both for this cause and for any and all appeals as may be necessary;

d.  Award expert witness fees incurred by Dr. Chung in the preparation and prosecution of this action;

e.  Award pre-judgment and post-judgment interest as allowed by law;

f.  Award costs of court and costs of prosecuting Dr. Chung's claims; and

g.  Award such other and further relief to which Dr. Chung may be justly entitled.


Respectfully submitted,


SUD LAW P.C.


*/s/ Nitin Sud*

Nitin Sud
State Bar No. 24051399
6750 West Loop South
Suite 920
Bellaire, TX 77401
Phone: 832-623-6420
Fax: 832-304-2552
Email: nsud@sudemploymentlaw.com

ATTORNEY FOR PLAINTIFF, HANNAH CHUNG, MD

OF COUNSEL:

GARDNER EMPLOYMENT LAW

*/s/ Barbara J. Gardner*
Barbara J. Gardner
Federal ID No. 922
108 Wild Basin Rd S #250
Austin, TX
Telephone:  (832) 834-3210
Facsimile:  (832) 998-8118
Email: Barbara@GardnerEmploymentLaw.com

ATTORNEY FOR PLAINTIFF, HANNAH CHUNG, MD